UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 25 CR 463 |
| v. | |
| KEITH GRIFFIN | Judge LaShonda A. Hunt |

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant willfully disobeyed four court orders for almost nine months. Those court orders required defendant's law firm to pay surviving family members, including children, of loved ones who died in an airplane crash off the coast of Indonesia settlement funds from a federal lawsuit. They were all defendant's clients and defendant lied to them about why they had not received their full settlement funds from that lawsuit. Defendant lied to cover for the senior partner at his firm, Thomas Girardi, because defendant knew that Girardi no longer had all the settlement funds with which to pay them back. Ultimately, Girardi's fraud was exposed and the clients received their money. But defendant's willful disobedience of the court's payment orders exacerbated and prolonged Girardi's fraud. To account for the seriousness of defendant's conduct, but also recognizing that a more senior lawyer at the firm (David Lira) received a sentence of four months' imprisonment, the government recommends that the Court sentence defendant to a term of three months' imprisonment, as recommended by the Probation Department. This sentence

is sufficient, but not greater than necessary, to satisfy the principles set forth in the Sentencing Guidelines and 18 U.S.C. § 3553(a).

## OVERVIEW

Defendant worked as a salaried lawyer for Thomas Girardi at the California law firm of Girardi & Keese ("GK"), which handled catastrophic personal injury matters on behalf on injured victims across the world. At the time of the events below, defendant had been a licensed attorney for 20 years and spent his entire career working at GK. Defendant made approximately $450,000 a year and made approximately $225,000 in 2020. Unlike David Lira (who was sentenced to four months' imprisonment by Judge Rowland for his contempt conviction in *United States v. Lira*, No. 23 CR 54), defendant did not have access to GK's bank accounts and was not as high up in the firm as Lira.

In October 2018, Lion Air Flight 610 crashed in the Java Sea off the coast of Indonesia. Over the next year, family members (the "Victim Clients") filed lawsuits against Boeing that were ultimately consolidated before Judge Durkin in the U.S. District Court for the Northern District of Illinois. The cases were initially filed in Illinois state court and removed to federal court. Defendant was admitted to the general bar for the Northern District of Illinois for purposes of these cases. Edelson P.C. ("Edelson") served as GK's local counsel in Chicago in the Lion Air matters. Between July 2019 and January 2020, Lira and defendant represented the Victim Clients at mediations with Boeing and ultimately settled the Victim Clients' cases.

2

Four of those settlements required court approval because there were minors who were part of the settlements.

On February 21, 2020, Ari Scharg of Edelson filed joint motions for dismissal of the four cases that required Judge Durkin's approval for the settlements. Defendant was on the signature block of each of those motions, although he did not have an appearance on file in the federal cases. Those filings included a declaration from Scharg submitted under seal that detailed how the settlement proceeds would be distributed amongst the minors and further provided that the payments "shall be sent as soon as practicable via wire transfer":

> 11. The settlement funds for the minor plaintiffs in this case shall be initially paid to a trust account established by Girardi Keese for the benefit of the Plaintiffs, including the minors. Pursuant to instructions provided to counsel by Plaintiff        in her role as legal guardian for the minor plaintiffs, the Plaintiffs' net proceeds (identified above) shall be sent as soon as practicable via wire transfer to PT Bank Madiri, Indonesia's largest bank and leading Islamic banking institution.

Three days later, on February 24, 2020, Judge Durkin entered the first of four orders, which expressly incorporated the language that the settlement payments be "sent as soon as practicable" (as copied below). Judge Durkin entered two additional identical orders on March 4, 2020 and entered the last order on March 9, 2020.

5. The settlement funds shall be distributed to Plaintiff _____ , individually and as legal guardian of the minor plaintiffs, in accordance with the process identified in Plaintiff's counsel's sealed affidavit; and

6. The court retains jurisdiction to effectuate settlement.

ENTERED: 2/24/2020

Hon. Thomas M. Durkin
U.S. District Court Judge

The chart below details when GK received the settlement funds from Boeing for each of the Victim Clients. Each of the settlements at issue funded in March 2020. The last settlement to Victim E on June 9, 2020 did not require court approval so there was no order associated with it:

## Lion Air Settlement Funds Wired to GK IOLTA

| Lion Air Client | Wire Transfer Date | Amount Transferred into GK IOLTA | Amount Due to Client |
|---|---|---|---|
| Victim A | 3/4/2020 | $ 2,105,000 | $ 1,710,000 |
| Victim B | 3/11/2020 | $ 2,530,000 | $ 2,060,000 |
| Victim C | 3/27/2020 | $ 2,112,500 | $ 1,725,000 |
| Victim D | 3/30/2020 | $ 2,530,000 | $ 2,060,000 |
| Victim E | 6/9/2020 | $ 1,317,500 | $ 1,069,500 |
| Totals: | | $ 10,595,000 | $ 8,624,500 |

4

Defendant was aware when each settlement funded and wrote memos to Girardi reflecting as such. Below is the first memo from March 4, 2020 that defendant wrote after the first settlement funded. The memo also references the fact that the settlement was subject to a court order:



## MEMORANDUM

| | |
|---|---|
| To: | TVG |
| CC: | Chris K., David L. |
| From: | KDG |
| Date: | March 4, 2020 |
| Re: | Boeing – |

Dear Tom:

We should be receiving the settlement funds by wire today on the first Boeing case,

Total Gross Settlement: $2,500,000

Per the release and Court order, the funds are to be disbursed as follows:

$395,000 to California Attorney Lending (directly from Boeing)

$2,105,000 to Girardi Keese Trust at Torrey Pines

From the $2,105,000, the funds are to be disbursed as follows:

**$1,710,000 to be wired to the clients per the attached Consent.**

$355,000 remaining attorney fees. Need to pay the Edelson firm who is entitled to 50% of the net fees. Also have     who is the referring attorney.

$25,000 to Girardi/Edelson for costs.

$15,000 to Girardi Keese to repay Client Advance.

End Memo.

On April 2, 2020, one of the Victim Clients emailed defendant about her settlement payment, and defendant emailed back blaming the Covid pandemic as an excuse for the delay in payment. GK was still able to process incoming and outgoing

wires during this point in the pandemic. The next day defendant acknowledged to the Victim Client in an email that the firm had received her settlement, but did nothing to dispel the notion that he created that Covid was the reason for the delay.

On Thu, 2 Apr 2020 at 04.12 Keith Griffin <kgriffin@girardikeese.com> wrote:

Hi        I hope you are staying healthy.

I have forwarded your request for an update to our accounting department and to Mr. Girardi.

Our office is currently closed due to the Coronavirus.

As soon as I get a response with a firm date for transmission of funds, I will let you know right away.

Please stay safe.

Keith

Further, also on April 2, 2020, defendant was copied on email correspondence with another Victim Client—who had asked if GK could loan her $40,000. She was unaware that her settlement had already funded and that she was rightfully entitled to all of her money. In the email correspondence below, defendant was copied on Girardi's approval to send one of the Victim Clients $40,000 under the auspices of a "loan," which defendant knew was false.

From:

To:                 Chris K. Kamon
CC:                 David Lira; Keith Griffin;
Sent:               4/3/2020 5:01 45 PM
Subject:            Re:      case lion Air


Thank you

Sent from IPhone

On Apr 3, 2020, at 2:59 PM, Chris K. Kamon <ckamon@girardikeese.com> wrote:


Tom just gave the ok to advance the $40,000.00. It's too late to process today, so I will process this wire first thing Monday.

From:
Sent: Thursday April 02, 2020 7:41 PM
To:                 Keith Griffin; David Lira
Cc: Chris K. Kamon
Subject: Re:      case lion Air

Hello All,

  wrote me on WhatsApp with a list of things she has ordered for her meat company, including a picture of a freezer or something LOL - My recommendation, if    s funded, get an okay and send her the money. If you don't have the money, advance her the 40, the repayment is solid. At present, she owes GK $10,000.

Stay safe.

George


From:
Date: Thursday, April 2, 2020 at 7:29 PM
To: "Keith D. Griffin (kgriffin@girardikeese.com)" <kgriffin@girardikeese.com>, David Lira <dlira@girardikeese.com>,
Subject: Re:      case lion Air

Dear Mr David and Mr Lira

Mr. David and Mr. Keith, can you lend me 40,000 dollars? I really need it right away. I have a business, if waiting for liquid boeing money there is still no certainty.

Thank you very much.

A few weeks later, on April 17, 2020, defendant was copied on an email from Lira to the Victim Clients where Lira lied to them about the delay in sending their settlement payments, again blaming it on the pandemic:

7

From: David Lira <dlira@girardikeese.com>
To:

BCC: kgriffin@girardikeese.com
Sent: 4/17/2020 1:36:00 PM
Subject: Your cases

Good morning

First, I want to thank you for your patience during this unfortunate pandemic. Our office has been closed since March 16th as a result of government mandates. It has been extremely difficult to run the day-to-day law office operations without employees present. Rest assured we are doing everything we can with limited staff. Tom Girardi has final say as to all wire transfers. It is "on his to do list." Our office is closed today due to a massive sanitation/disinfectant effort due to a COVID scare this week. I will keep you advised I hope you and your families are safe and sound. David

A few weeks later, on May 4, 2020, defendant wrote Girardi a memo telling him that the Victim Clients left "[l]ots of messages over the weekend. Client funds need to be wired."

## GIRARDI | KEESE
### LAWYERS

## MEMORANDUM

| | |
|---|---|
| **TO:** | TVG |
| **CC:** | DRL, Chris K. |
| **FROM:** | KDG |
| **DATE:** | May 4, 2020 |
| **RE:** | Boeing |

Dear Tom:

Lots of messages from Boeing clients over the weekend. Client funds need to be wired.

$1,710,000

$2,020,000

$1,725,000

$2,060,000

8

By early May 2020, the Victim Clients continued to email defendant, Lira, and Girardi about their settlement funds. As a result, Girardi instructed Christopher Kamon (GK's CFO) to wire them half of their money, and used defendant as an intermediary to do so:

| | |
|---|---|
| **From:** | Keith Griffin <kgriffin@girardikeese.com> |
| **To:** | Chris K. Kamon <ckamon@girardikeese.com>;David Lira <dlira@girardikeese.com> |
| **Sent:** | 5/6/2020 12:03:39 PM |
| **Subject:** | Lion Air |

Chris:

Tom told me that we should wire 50% of the client funds for the four cases in trust and advise clients that the remaining 50% would be wired in 14 days.

I show the following balances owed to the four clients as:

$1,710,000

$2,020,000 (you recently sent him 40k)

$1,725,000

$2,060,000

A week later, on May 13, 2020 and May 14, 2020, Girardi drafted false letters to the Victim Clients providing made up reasons for the delays (e.g., tax issues). Defendant sent the letters to Lira who initially told Girardi's assistant not to send them out. Girardi revised the letters, and his assistant sent the revised versions to Lira (which still contained outright lies, but were toned down), and Lira responded that they were "Ok" to send out, and then quickly tried to walk back his authorization (defendant was not copied on this correspondence). Lira included defendant on his response to Girardi's assistant where he stated that none of the letters should have

9

been sent as they contained lies. Girardi's assistant sent out the letters to two of the Victim Clients. A few days later, defendant knew the false letters went to two of the Victim Clients after they reached out to a case runner at GK inquiring about them.

One week later, on May 19, 2020, even though defendant knew that the four settlements tied to Judge Durkin's orders had not been funded, he emailed to Boeing's lawyers Victim E's (the fifth client's) settlement release, which started the process for that settlement to be funded and sent to GK. Girardi ultimately stole this settlement money as well.[1]

In early June 2020, Lira quit working at GK leaving Girardi and defendant as the primary contacts at GK with respect to the settlements for the Victim Clients. On June 24, 2020, defendant sent another memo to Girardi, this time writing that a lawyer at Edelson wanted to speak with Girardi about the settlement payments. At this point, Edelson learned that the settlements had not been funded to the Victim Clients. Edelson lawyers, however, did not know that Girardi had misappropriated the settlement funds.

---

[1] Defendant knew that GK received Victim E's settlement funds by June 18, 2020.

June 24, 2020

TO: TVG

FROM: KDG

RE: Boeing Lion Air

Dear Tom:

Need to call Rafey today at the Edelson firm. He is our co-counsel on the Lion Air cases. His phone number is

He said that you were going to get back with him on Wednesday about completing payment to the Boeing clients. He is desperate to hear from you.

On July 6, 2020, Girardi had GK make additional lulling payments to the Victim Clients for $50,000 each and used defendant as an intermediary again to facilitate the payments. Although the email below states that Girardi instructed that "500K" was to be wired, the firm wired $50,000 to each of the four Victim Clients.

11

Sent from my BlackBerry - the most secure mobile device
From: kgriffin@girardikeese.com
Sent: July 6, 2020 11:35 AM
To: ckamon@girardikeese.com
Subject: Lion Air

Chris

Tom just said to wire 500K to each of the four Lion Air plaintiffs toward their net balance.

Keith

A week later on July 14, 2020, defendant sent another memo to Girardi about the status of the settlements telling Girardi that the remaining funds needed to be wired to the Victim Clients.

12



7.14.20

Re: Lion Air

Dear Tom:

On the following four Lion Air cases,                     we have all the settlement proceeds in trust. You previously disbursed 50% of the net proceeds to the clients. I believe you recently sent each of them an additional $50,000 toward their net recovery. The balance of the net recovery, approximately $850,000 each, needs to be wired to the clients. Chris K. has all the wire instructions and balances owing.

The Edelson firm – local counsel in Chicago – has asked for an update on the disbursements to the clients and their associate counsel fees.

End Memo.

KDG

And three days later, on July 17, 2020, defendant sent another memo to Girardi about the status of the settlements telling Girardi that the remaining funds needed to be wired to the Victim Clients.

13

July 17, 2020

TO:       TVG

FROM:    KDG

RE: Lion Air

Dear Tom:

The Edelson firm is our co-counsel in Chicago on the Lion Air cases. They signed the declarations on the minor's compromises and settlement approval motions in federal court. They need to hear back from you on completing the payments to the clients. This is urgent.

End memo.

That same day, defendant received the email below (unrelated to the Boeing cases) about how other GK clients had not been paid money. Defendant was copied on similar emails for this case over the next week in July 2020 and on another email chain regarding a separate case with a GK client complaining that they were not paid.

14

Full Name

To whom it may concern:

I am part of the _____ class action suit and have spoken to several people but most recently Van (not sure on spelling) about my mother's case, _____. It has been 2 years since my mother's passing and about a year since I have provided all essential documents and directives for my mother's remaining funds. Earlier this year I called the office and spoke to Van only to be given a run around as to why the funds had still not been disbursed. I've been patient and understanding, however, two years should be MORE than enough time for this to be resolved. I've called the offices and left voicemails with no response. My last email to the firm was on July 6, 2020. Still, no response. This is frustrating and highly unprofessional. What needs to be done in order to get answers? My mother's funds had already been allocated to her before her passing and to have to still be waiting for concrete reason as to why her family hasn't received any of it is disrespectful and unethical.

I expect an answer and this issue to be resolved immediately.

Best,

A few weeks later on August 3, 2020, defendant sent the memorandum below to Girardi. The same day, defendant also texted Rafey Balabanian from Edelson stating "Give [Girardi] a couple more days Rafey. I know he is working on this."

15

August 3, 2020

TO: TVG

FROM: KDG

RE: Boeing Lion Air

Dear Tom:

Just got a message from Rafey at Edelson (co-counsel).

He said you told him that clients would be paid in full today.

Said he needs to speak to you right away.

His phone number is

End memo.

Two weeks later, on August 17, 2020, one of the Victim Clients emailed Girardi and defendant stating in part that "It has been 3 months since you promised to transfer all the settlement fund. As you are aware, we are waiting for the end of this case with an ending that we deserve." Two weeks later on August 31, 2020, another of the Victim Clients stating in part "Its already September and you still did not answer our email or give confirmation when and how you will send the rest of that money. Put yourself as client please, we need to wait for months just to get a reply

16

from our lawyer? Write an official letter to use and explain the whole situation why you hold our money, and when you still the rest of them?"

On September 2, 2020, defendant responded to an email from the Victim Clients:

On Thu, Sep 3, 2020 at 5:15 AM, Keith Griffin wrote:

I know that you addressed this to Mr. Girardi and I am confident that he will respond officially once he is able.

I did just get notice from Mr. Girardi that he was able to release a large wire of funds today on your cases.

I don't have the exact amounts as of the time I am writing this.

The wires should go through first thing in the morning.

I want you to know that everyone at this law firm is committed to making sure that you get absolutely every dollar that you are entitled to receive.

I am sorry for the circumstances and the time you have had to wait.

That same day, defendant texted Balabanian that Girardi "sent a wire out this morning to them for half of their collective balance. I think the clients are fine for now. [Girardi] is trying to get the rest out by next week." In fact, Girardi had sent another lulling payment to the Victim Clients A – D, leaving each of them with an

17

outstanding balance of $500,000 each. These were the last payments that GK made to the Victim Clients.

Importantly, defendant knew where this money came from. During the contempt hearing before Judge Durkin in December 2021, defendant testified that the money sent to the Victim Clients in September 2020 came from attorney fees that defendant generated in an unrelated case. At this point in time (September 2020), defendant knew that the settlement money for the Victim Clients had been used for something else, and knew that new money was used to partially fund the Victim Clients' settlement. Additionally, defendant admitted before Judge Durkin that these fees also went to pay another client of defendant's who was owed money in an unrelated case. At this point, defendant knew that GK owed various clients' money (including the Victim Clients), did not have the money to pay those clients, and used attorneys' fees from another case to fund settlement payments for the Victim Clients that had been fully funded months earlier by Boeing (which defendant also knew). Defendant also knew that GK was not allowed to take any fees on the Lion Air cases, as those fees had been assigned to a lender.

The following month, in October 2020, one of the Victim Clients emailed Girardi and defendant stating "The 2nd anniversary of the incident is near. I can't turn back time, but you can help us so that the children of the deceased can have a

18

good time and education. Please send the remaining $500,000 in cash this month before the anniversary of the sad events.[2]"

On October 2, 2020, Victim E (the fifth client whose settlement did not have a court order) emailed defendant directly asking "And also I need confirmation, has GK received all the money for my settlement from Boeing?" Defendant knew that GK received those funds more than three months earlier, but responded stating "I am the only one in the office right now. As soon as I hear from Mr. Girardi and the bookkeeper[,] I will advise." Victim E continued to email defendant for updates. Defendant emailed Girardi stating that Victim E was emailing about his settlement, which had been misappropriated by that point.

Soon thereafter, Girardi sent more memos to the Victim Clients stating that they would be paid by November 29, 2020. Defendant was on later correspondence in October 2020 referencing Girardi's statement to pay. Victim E continued to email defendant, who on October 29, 2020, responded to an email from Victim E stating "I am sorry that I don't have a firm answer for you yet. I am sending your request again to our accounting department and Mr. Girardi." On November 9, 2020, Victim E emailed defendant again "I know your firm has received the money from Boeing, and somehow you are using my money for something else. For your own benefit. That's

---

[2] These are illustrative examples of emails during this timeframe from the Victim Clients. They continued to reach out late in the summer and the fall of 2020 inquiring about their settlement payments.

19

why you guys keep silent all this time." The next day, November 10, 2020, defendant confirmed to Victim E that GK had received his settlement funds.

On November 17, 2020, defendant texted with Balabanian stating "Hey, man, just an update. [Girardi's] still at home. Haven't been able to speak to him" and that defendant was still trying to set up a call with Girardi and the Victim Clients "about the balance of their funds that he needs to pay them." Balabanian responded that "I thought he had finally paid them and only owed us fees." Defendant also emailed Girardi that day stating "All of the Boeing clients are asking for a status on their settlement funds. You really need to speak to them. Can I set up a phone call for you to speak with them?"

The same day—November 17, 2020—defendant emailed the Victim Clients "I understand your concern and wanting clarification and details. Mr. Girardi is the sole owner of the firm and is the person with whom you need to speak. Would you be interested in setting up a phone call with Mr. Girardi perhaps sometime next week? He had surgery last week and is currently at home recovering. Please let me know and I will do everything I can to set up a phone call." Defendant reached out to an ethics attorney that day for the first time throughout this whole process. The next day, Defendant sent Girardi the following memo:



11/18/20

Dear Tom:

You have 12 days to pay the Boeing clients the balance of their funds.

They are owed $3,069,500. They are also owed about $180,000 in interest they are demanding.

If they do not receive their funds by Nov 30th, they have indicated that they are all filing bar complaints and a criminal complaint with the DA's office.

This could not be more serious.

End memo.

KGD

On November 30, 2020, Defendant told Balabanian that the Victim Clients still had not been paid and referred Edelson to a former GK lawyer to discuss suing the firm. A few days later on December 3, 2020, defendant sent another memo to Girardi (copied below). That same day, Edelson filed a rule to show cause with Judge Durkin alerting the Court that GK had not paid the Victim Clients.

12-2-20

Dear Tom

The following remains owed to the 5 Boeing clients:

1.   $500,000
2.   $500,000
3.   $500,000
4.   $500,000
5.   $1,069,500

One year later in December 2021, Judge Durkin held an evidentiary hearing where defendant testified. Defendant admitted to representing the Victim Clients and testified that he believed that Girardi was bound by Judge Durkin's orders and that Girardi would ultimately pay the Victim Clients. Defendant denied knowing throughout 2020 when Girardi was lying to the Victim Clients that such a situation had happened before at the firm. Defendant also testified that he did not contact an ethics attorney until November 2020 and never thought to contact the Court. Judge Durkin questioned defendant directly about Victim E. Judge Durkin asked defendant "Were any of your answers lulling in the sense you told him 'Don't worry, it's on the way?" to which defendant responded "No. No. I was direct with him. He asked if the money had come in. I told him it did. He asked when it would be wired, and I told him as soon as Girardi approved it, and I did not lull him."

22

In November 2022, Judge Durkin issued his opinion finding that the rule to show cause was mooted by Edelson's payment of the outstanding amount owed to the Victim Clients. Judge Durkin made the following finding about defendant and Lira's testimony:

> Griffin and Lira knew from the start that Girardi did not pay the clients when he was supposed to. And they knew at least as early as May 12, 2020 that Girardi was lying to the clients about the reasons for the failure to pay the full amounts. Griffin and Lira both testified that they never believed that Girardi intended to steal the money, and that they always assumed he would eventually pay the clients. The Court is skeptical of these assertions, however. Evidence of Girardi's repeated malfeasance with clients has been well-documented in the press since these allegations surfaced. Griffin and Lira worked with Girardi for many years. Indeed, Lira is his son-in-law. It is not credible that Griffin and Lira were so completely unaware of the prior disputes over client payments that they had no suspicions of Girardi's conduct and motives.
>
> Moreover, the email communications regarding this specific incident indicate that Griffin and Lira were not surprised that Girardi was lying to the clients. First of all, Girardi's secretary apparently found it appropriate and necessary to check with Griffin and Lira before sending the letters. This is a curious process unless the staff had some sense that Girardi was not to be entirely trusted. Furthermore, Griffin stated that he had "intercepted" the letters, implying that he was regularly playing defense with respect to Girardi's conduct. And Lira's communications referenced another previous instance of similar conduct. In short, it is difficult to believe Griffin and Lira were unaware that Girardi was running a Ponzi scheme with client money, which in fact he was.
>
> ***
>
> Griffin's conduct was just as bad, if not worse [than Lira's]. Like Lira, Griffin knew that Girardi's excuses were lies. And like Lira, Griffin abetted the lies by hiding them from the Edelson firm. Griffin was in regular communication with Balabanian through the summer and fall of 2020. Not only did Griffin not reveal Girardi's lies, he came perilously close to repeating them when he told Balabanian in a text message, "I

23

know Girardi is working on this [on August 3, 2020]." Girardi was working on nothing but trying to hide the theft. Even when he finally informed the Edelson firm in November 2020 that the clients had not been fully paid and Girardi didn't have the money to pay them, Griffin did not reveal that he had known since May that Girardi was lying to the clients. Further, he continued to attempt to dissuade the Edelson attorneys from involving the Court by recommending they consult a conflict former Girardi & Keese attorney who he claimed to have arranged to pursue malpractice claims. This conduct is at best an effort to pass the buck and at worst a knowing cover-up. None of it demonstrates concern with the money owed to clients whose family members were victims of a tragic accident. All of it is simply inexcusable.

## The Advisory Guidelines Range

The government agrees with the advisory guidelines range calculated in the Presentence Investigation Report ("PSR"). *See* PSR, ¶¶ 36-45. As detailed in the PSR, the adjusted offense level is based on the following:

| | |
|---|---|
| Base Offense Level (§§2J1.1, 2X5.1, 2J1.2(a)) | 14 |
| Vulnerable Victim (§3A1.1(b)(1)) | 2 |
| Abuse of Trust (§3B1.3) | 2 |
| Acceptance of Responsibility (§3E1.1(a),(b)) | -3 |
| Total | 15[3] |

Judge Rowland found in the *Lira* sentencing that the obstruction guideline was the most analogous offense, and the government concurs here. Further, Judge Rowland also found that the vulnerable victim and abuse of trust enhancements were

---

[3] The zero point offender reduction under § 4C1.1 is inapplicable because of the vulnerable victim enhancement. *See* U.S.S.G. §4C1.1(a)(9).

24

applicable. As detailed below, the government believes that these adjustments are also appropriate.

### *Defendant Knew Or Should Have Known That A Victim Of The Offense Was A Vulnerable Victim*

Section 3A1.1(b)(1) provides for a two-level increase to adjusted offense level if "the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). Application Note 2 to §3A1.1 further provides that a vulnerable victim includes those who are unusually vulnerable "due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1(b)(1), App. N. 2. The government need only establish by a preponderance of the evidence that a single victim was vulnerable, and no other factor "need accompany age so long as the victim's vulnerability is related to the victim's age." *United States v. Sims*, 329 F.3d 937, 944 (7th Cir. 2003); *United States v. White*, 737 F.3d 1121, 1142 (7th Cir. 2013); *see also United States v. Julian*, 427 F.3d 471, 489 (7th Cir. 2005) (enhancement warranted based on children's economic vulnerability).

Here, certain of the victims were minors and their settlements required court approval. All of the victims were also non-English speakers residing half a world away in Indonesia who were unfamiliar with the American legal process and relied on defendant to represent them. PSR, ¶ 38; *cf. United States v. Rumsavich*, 313 F.3d 407, 413 (7th Cir. 2002) (investment fraud scheme targeting elderly investors who

25

"had a lower than average ability to protect themselves" warranted enhancement); *United States v. Johns*, 686 F.3d 438, 460 (7th Cir. 2012) (financial desperation can make a victim vulnerable for purposes of this enhancement). They were vulnerable victims due to their age and given that they were particularly susceptible to the criminal conduct here given their unfamiliarity with the English language as non-native speakers and the American legal system. *United States v. Parolin*, 239 F.3d 922, 926-27 (7th Cir. 2001) (enhancement warranted where victim was financially unsophisticated, spoke and wrote limited English, and had just lost her husband). This enhancement also negates a two-level reduction for zero-point offender relief in §4C1.1. *See* U.S.S.G. §4C1.1(a)(9).

### *Abuse of Trust and Use of a Special Skill*

Section 3B1.3 provides for a two-level enhancement to the adjusted offense level if "the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission of the offense." U.S.S.G. §3B1.3. Application Note 4 provides that a special skill "refers to a skill not possessed by members of the general public and usually requiring substantial education, training, or licensing" and includes "lawyers." U.S.S.G. §3B1.3, App. N. 4. As an attorney, defendant was a licensed member of the California State Bar who represented the Victim Clients in civil litigation. Defendant used his knowledge of the legal system to falsely assure the Victim Clients that their settlements were on the way, when in fact, defendant knew that Girardi had stolen the settlements.

26

Defendant's role as an attorney here warrants this two-level enhancement. *See* PSR, ¶ 40; *United Sates v. Polichemi*, 219 F.3d 698, 713 (7th Cir. 2000).

***Advisory Guidelines Range***. As detailed in the PSR, an adjusted offense level of 15 combined with criminal history category I yields an advisory guidelines range of 18 to 24 months' imprisonment. The government is recommending a below-guidelines sentence of three months' imprisonment.

### The Factors Set Forth in 18 U.S.C. § 3553(a)

Section 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.[4] In order to determine the sentence to impose, the Court must consider the statutory factors listed in § 3553(a)(1)-(7). One of those factors is the advisory range set by the Sentencing Guidelines, and another is the Sentencing Commission's policy statements. Although the Sentencing Guidelines are advisory only, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). For the reasons set forth below, consideration of the § 3553(a) factors reflects that a sentence of three months' imprisonment is warranted and necessary.

---

[4] Those purposes are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

27

### The Nature and Circumstances of the Offense

Defendant willfully violated a court order. There were also real victims here: Victims A, B, C, D, E, and their families lost millions of dollars that rightfully belonged to them. Those victims were also in a terrible point in their lives when they sought representation from GK, having suddenly lost their loved ones in an airplane crash. GK exploited their vulnerability, and defendant was their lawyer too and he let Girardi exploit them. In March 2020, when Boeing started funding settlements for the Victim Clients, Girardi did not pay the Victim Clients their settlements and lied to them. Defendant helped Girardi cover-up the fact that GK was not paying clients and that both he and Girardi were lying to clients about the reasons for those delays. The Victim Clients here lived thousands of miles away and relied on GK to represent them. Instead, Girardi lied to the Victim Clients about why they had not received their settlement money to conceal the fact that Girardi had stolen it. Defendant too lied to the Victim Clients to cover for Girardi and in doing so disobeyed Judge Durkin's payment orders.

### History and Characteristics of Defendant

This § 3553 factor is both mitigating and aggravating. Defendant is not Girardi. Defendant spent his career working as a plaintiff's lawyer protecting those who were victims of traumatic injuries. This is all mitigating, but at the same, it is aggravating. Society looks to people like defendant to uphold the rule of law. When

28

someone like defendant commits a crime this like one, it breeds cynicism of the legal profession.

### The Need to Promote Respect for the Law, Provide Just Punishment, and Afford Adequate Deterrence

The government's recommended sentence would promote respect for the law, provide just punishment, and afford adequate deterrence. The public needs to know that there will be serious consequences when lawyers commit crimes. In addition, intertwined with promoting respect for the rule of law—and equally important—is the concept of general deterrence. *See United States v. Arroyo*, 75 F. 4th 705, 709 (7th Cir. 2023) ("General deterrence is, after all, an economic theory of punishment: 'Where the profits to be made from violating the law are higher, the penalty needs to be correspondingly higher to achieve the same amount of deterrence.'" (quoting *United States v. Cavera*, 550 F.3d 180, 196 (2d Cir. 2008) (en banc)); *United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) (stating that "white-collar criminals . . . are . . . prime candidates for general deterrence"); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("[C]onsiderations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Murtha*, 803 F. App'x 425, 428 (2d Cir. 2020) (affirming top of the guidelines sentence in a case where a lawyer stole from clients noting that the district court "explained the particular

29

need for deterrence in this case in order to send the 'right message to lawyers . . . that lawyers [do not] get special deals.'").

### The Need to Avoid Unwarranted Sentencing Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

Defendant is the fourth person to be sentenced in connection with Girardi's fraud scheme and is the least culpable in the government's view. Girardi was sentenced to 87 months' imprisonment in the Central District of California in connection with an unrelated fraud scheme involving client theft. The Victim Clients here were included as aggravation under 18 U.S.C. § 3553(a) during Girardi's sentencing and the government dismissed the charges against Girardi in this Court. Judge Rowland sentenced Kamon to 65 months' imprisonment in connection with his wire fraud guilty plea in connection with the Lion Air victims, which ran concurrently to the approximate 10-year sentence that Kamon received in California. And Judge Rowland sentenced Lira to four months' imprisonment after he pleaded guilty to criminal contempt.

Defendant is the least culpable of those who have already been sentenced. Defendant was also not as knowledgeable as Lira about the financial dealings of GK leading up to the Lion Air settlements. For instance, in the fall of 2019, Lira, by virtue of his role as second-in-command at GK in addition to the fact that Lira was Girardi's son-in-law knew that the firm was in dire financial straits. Lira knew that the firm was having trouble paying its bills and that Girardi had not paid other clients in

separate matters. This was all before the Lion Air settlements were funded in March 2020. The government also argued at Lira's sentencing that Lira was not truthful with Judge Durkin when asked about Lira's prior knowledge of other GK clients who were not timely paid their settlement funds, which further concealed Girardi's theft and fraud scheme.

Given these other sentences, and to avoid disparities, the government believes—as the Probation Department recommended—that a term of three months' imprisonment is a fair sentence.

## CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court impose a sentence of imprisonment of three months' imprisonment. Such a sentence is well supported under Section 3553(a), as it will reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, properly account for defendant's history and characteristics, and provide a fair and uniform sentence.

Dated: July 20, 2026                              Respectfully submitted,

                                                  ANDREW S. BOUTROS
                                                  United States Attorney

                                        By:       */s/ Jared Hasten*
                                                  JARED HASTEN
                                                  Assistant United States Attorney
                                                  219 S. Dearborn Street, 5th Floor
                                                  Chicago, Illinois 60604
                                                  (312) 353-5300
                                                  jared.hasten2@usdoj.gov